UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 04-20250-CR-JORDAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

NICHOLAS BACHYNSKY,

    Defendant.

_____/

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF HIS SUPPLEMENTAL MOTION FOR NEW
TRIAL BASED ON NEWLY DISCOVERED, EXCULPATORY EVIDENCE**

Defendant Nicholas Bachynsky, by and through undersigned appointed counsel and pursuant to the Court's instructions given at the conclusion of the February 25, 2011, evidentiary hearing held in this matter, hereby files this Supplemental Memorandum in Support of His Supplemental Motion for New Trial Based on Newly Discovered, Exculpatory Evidence (the "Supplemental Motion").[1]  During the evidentiary hearing, co-Defendant Richard Anders provided sworn testimony that is not only highly relevant to the charges that Dr. Bachynsky faced at trial, but that also <u>guts</u> the heart of those charges.  Mr. Anders denied, however, having made various unequivocal statements exonerating Dr. Bachynsky of the securities fraud at issue.  Each of these denials is contradicted by the terms of the five sworn affidavits appended to Dr. Bachynsky's

---

[1] This Supplemental Memorandum is largely limited to the effect of the sworn testimony that co-Defendant Richard Anders provided at the February 25 evidentiary hearing. It is supplemental to the discussion and arguments set forth in Dr. Bachynsky's underlying Supplemental Motion (DE #826) and the Reply Memorandum in support thereof (DE #837), which are incorporated herein.

Supplemental Motion. As explained herein, Mr. Anders' testimony is meaningful, Dr. Bachynsky's Supplemental Motion is well founded, and that motion should be granted.

## ARGUMENT

For a number of reasons, Mr. Anders' testimony provides sufficient newly discovered evidence to warrant granting Dr. Bachynsky's Supplemental Motion. In the alternative, and at a minimum, Mr. Anders' testimony is sufficient to require a full evidentiary hearing be held, at which time the affiants can be placed on the stand and elaborate on their sworn statements.

### I. Mr. Anders' Testimony About Dr. Bachynsky's Lack of a Material Role in the Investment Scheme at Issue

The Court began the February 25 hearing by asking a series of purposefully open-ended questions concerning what Mr. Anders could share about Dr. Bachynsky's involvement or lack of involvement in the Helvetia scheme at issue. This colloquy, which is largely consistent with the remainder of Mr. Anders' exculpatory testimony, is telling:

> THE COURT: Mr. Anders, my question for you is: What can you tell us, if anything, about Mr. Bachynsky's involvement or lack of involvement in the fraudulent scheme that went on with regards to Helvetia? . . . .
>
> THE WITNESS: Well, Dr. Bachynsky, most of the time he wasn't – he was overseas, you know, in Europe, but he was aware we were raising money for the – for Helvetia, but he wasn't involved in any of the raising of the money except for two or three times that he talked to some clients that invested.
>
> THE COURT: With regards to, for example, some of the literature that was prepared on behalf of Helvetia with regards to some of the things that it was proposing and told investors about, what, if anything, was Mr. Bachynsky's involvement or lack of involvement?
>
> THE WITNESS: Well, the business plan that was sent out, he – he – he developed that business plan. But it wasn't supposed to be mailed out, but he did – he did develop it.
>
> THE COURT: What discussions, if any, did you have with him about what investors were being told or not told about what Helvetia was promoting and how and why it was raising money?

>THE WITNESS: Uhm, Judge, I don't know if we ever discussed that at all.

Transcript of 02/25/11 Hearing, DE #870, at 06:15 – 07:18. Throughout the remainder of his testimony, Mr. Anders provided further details as to Dr. Bachynsky's lack of any real involvement in the financial fraud in question – and, critically, <u>lack of any agreement to conspire with Mr. Anders</u> to undertake such financial fraud.

Concerning any discussions with potential investors, Mr. Anders unequivocally confirmed that Dr. Bachynsky <u>never</u> spoke with a man named Ralph Klein, although at trial, Dr. Bachynsky was charged and convicted of Counts 9 and 10 of the Third Superseding Indictment, both of which focused exclusively on Mr. Klein. <u>See</u> <u>id.</u> at 09:18 ("He never spoke to Ralph Klein, never."). This alone should be sufficient to justify Dr. Bachynsky's entitlement to a new trial. With respect to the business plan, Mr. Anders testified that when Dr. Bachynsky learned that it was being mailed out to investors, Dr. Bachynsky became "quite upset" and did not condone in <u>any</u> respect the fact that it was being so distributed. <u>See</u> <u>id.</u> at 09:19 – 10:01; 10:13-15; <u>see also</u> <u>id.</u> at 55:12 – 56:23 (confirming that Dr. Bachynsky was "very, very irate" and "very upset" about the business plan being sent out because "there were a lot of mistakes, and . . . it wasn't finished, it should never have been sent out"). And with respect to Dr. Bachynsky's undertakings in Europe (where Mr. Anders had said Dr. Bachynsky was "most of the time" in question, <u>see</u> <u>id.</u> at 06:23), Mr. Anders confirmed what Dr. Bachynsky's trial counsel had earlier advocated: that Dr. Bachynsky was there treating patients, <u>not</u> defrauding investors. <u>See</u> <u>id.</u> at 19:13-20. Mr. Anders further testified that Richard Friedman, the New York securities lawyer with whom Mr. Anders and Dr. Bachynsky consulted prior to doing anything about Helvetia, expressly told them – <u>after</u> being fully informed of their respective pasts – that they did not need to disclose those pasts in connection with any Helvetia offerings. <u>See</u> <u>id.</u> at 35:13-14; 57:09 – 58:15.

3

Mr. Anders' final answer on direct examination was one of the most meaningful. When Mr. Anders was directly asked, "You never reached an agreement with Dr. Bachynsky on a scheme to defraud Helvetia investors of their money, did you?", his answer could not have been more clear: "No." Id. at 29:17-19; see also id. at 53:04 – 54:06. Such admission is momentously important, particularly with respect to the conspiracy charge of which Dr. Bachynsky was convicted and for which Dr. Bachynsky was given a forty-eight-month sentence. See, e.g., United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998) ("In order to sustain a conviction under 18 U.S.C. § 371, the government must prove (1) the *existence of an agreement* to achieve an unlawful objective; (2) the defendants' *knowing and voluntary* participation in the agreement; and (3) the *commission of an act* in furtherance of the agreement. The government must prove an agreement between at least two conspirators to pursue jointly an illegal objective. The government must also prove beyond a reasonable doubt that each defendant had a 'deliberate, knowing, specific intent to join the conspiracy.'") (emphases original; internal citations omitted); see also United States v. Sans, 731 F.2d 1521, 1532 (11th Cir. 1984) (stating, in holding that statements of an untried coconspirator were admissible and relevant as to conspiracy charges against the defendant, that "[s]ince [the declarant] was an alleged coconspirator, his state of mind was relevant") (emphasis added).

## II. This Testimony Satisfies the Standard to Warrant a New Trial

The substance of Mr. Anders' recent testimony is sufficient to warrant granting Dr. Bachynsky a new trial. As discussed in Dr. Bachynsky's Supplemental Motion, in the Eleventh Circuit,

> [f]ive criteria apply to a motion for new trial based on newly-discovered evidence:
>
> (1) the evidence must be discovered following the trial; (2) the movant must show due diligence to discover the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the

4

      court; and (5) the evidence must be of such a nature that a new trial would probably produce a new result.

United States v. Gates, 10 F.3d 765, 767 (11th Cir. 1993) (internal quotations and citation omitted). Here, Mr. Anders' recently given testimony squarely satisfies the required burden.

      First, like the co-defendant's exculpatory affidavit in Gates, which Gates obtained "[a]pproximately six months after the trial," id., Mr. Anders' testimony was discovered well after the conclusion of Dr. Bachynsky's trial. In this regard, it is important to note that the record is utterly devoid of circumstances to which the Government can point that show that Dr. Bachynsky or his trial counsel had any idea prior to or during trial that Anders would give any such exculpatory testimony. See id. (stating that "[t]he government has not pointed to any evidence in the record indicating that before or during trial Gates knew or had access to knowledge that James would exculpate him and describe the robberies as involving other co-participants"). In this regard, any argument that the Government may raise about Dr. Bachynsky's trial counsel's decision not to call Mr. Anders as a witness fails under the authority of Gates. As that Court noted in rejecting a similar argument the Government there raised, such argument "presupposes that [Dr. Bachynsky] knew that [Anders] would give exculpatory testimony" and, further, "is contrary to common sense." Id. at 768.[2] Neither Dr. Bachynsky nor his counsel had any such idea until receipt of the affiants' sworn statements. Thus, their decision not to call Mr. Anders as a witness is irrelevant.

      Second, like the defendant in Gates, here, Dr. Bachynsky has established due diligence with respect to Mr. Anders' testimony. Again, although Dr. Bachynsky did not call Mr. Anders

---

[2] Moreover, between his guilty plea and his sentencing, Anders would obviously have no motive to provide such exculpatory for Dr. Bachynsky, who the Government was still prosecuting. Now that he has been sentenced, Mr. Anders' motivation to tell the truth about Dr. Bachynsky's lack of involvement is more acute.

5

as a witness, Gates dictates that given the circumstances, Dr. Bachynsky need not have done so in order to satisfy the due-diligence prong of the new-trial analysis, because any argument to the contrary "presupposes that [Dr. Bachynsky] knew that [Anders] would give exculpatory testimony." Id.; see also id. at 767-68 (rejecting the argument that Gates "lacked due diligence because he did not ask the government to grant immunity to James and require him to testify"). And again, Dr. Bachynsky had no such knowledge.

Third, the new evidence – Mr. Anders' direct testimony – is clearly material and is neither merely cumulative nor impeaching. See id. at 767. This testimony, from the individual who both the Government and Dr. Bachynsky made a centerpiece in their respective trial presentations, goes to some of the core evidence and arguments the Government presented in its prosecution of Dr. Bachynsky:  Dr. Bachynsky's (lack of) involvement in the Helvetia fundraising; Dr. Bachynsky's (utter lack of) concealment of his criminal past from Richard Friedman and others; Dr. Bachynsky's (complete lack of) acquiescence in the decision to send out the rough business plan; and Dr. Bachynsky's steadfast devotion to the medical side of the DNP operations.

Fourth, at a new trial, Mr. Anders' testimony that he and Dr. Bachynsky never reached an agreement to defraud Helvetia investors of their money would be admissible and extremely material. This testimony would not be hearsay, and as controlling precedent from this Circuit has held, the state of mind of Mr. Anders, as Dr. Bachynsky's alleged coconspirator, is relevant to the conspiracy charge against Dr. Bachynsky. See United States v. Sans, 731 F.2d 1521 (11th Cir. 1984).  In Sans, Sans was charged with having conspired with Cohen to defraud the government (among other crimes) in relation to various banking and financial wrongdoings. See id. at 1524.  Due to health reasons, Cohen was not tried with Sans. See id.  At trial, and over Sans' relevance objection, the Government presented testimony of Chalmers to the effect that

6

Cohen had at one time approached Chalmers to discuss a loan from Chalmers' bank to set up a marijuana operation in Central America. See id. The appellate court affirmed the trial court's admission of this testimony, stating: "Cohen's comment to Chalmers about the marijuana loan was relevant to the issue of Cohen's criminal intent regarding the conspiracy. Since Cohen was an alleged coconspirator, his state of mind was relevant." Id. at 1532 (emphasis added).

The same analysis applies here, and thus the same result should obtain. Like Cohen's statements in Sans, Mr. Anders' statements in the case at bar go directly to his state of mind (i.e., his intent) with respect to the conspiracy he and Dr. Bachynsky are alleged to have entered into. In Sans, the statements confirmed the coconspirator's (Cohen's) intent; here, they dispel the coconspirator's (Mr. Anders') intent. Either way, the outcome on relevance is the same: "Since [Mr. Anders] [is] an alleged coconspirator, his state of mind [is] relevant." Id. Thus, Mr. Anders' unequivocal confirmation that he "never reached an agreement with Dr. Bachynsky on a scheme to defraud Helvetia investors of their money," Transcript, at 29:17-19, is admissible and material on the question of Dr. Bachynsky's intent, or mens rea, concerning the conspiracy charge. Indeed, this evidence is beyond material; it is critical.[3]

Fifth, the evidence is of such a nature that a new trial (which would be on only five counts, as opposed to the eighteen counts submitted to the jury in the original trial) would probably produce

---

[3] In this regard, Mr. Anders' equivocal statements that the Helvetia scheme "just came along that way," Transcript, at 53:11, even in the absence of any actual agreement between he and Dr. Bachynsky, are insufficient to support a conclusion that the required elements of the conspiracy charge against Dr. Bachynsky are satisfied by circumstantial evidence of what "just came along." While circumstantial evidence may be used to establish conspiracy or intent, an agreement between the alleged coconspirators remains a necessary component of a conspiracy conviction. See, e.g., United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998) (observing that one of the required elements of conspiracy is "the *existence of an agreement* to achieve an unlawful objective") (emphasis original). Thus, regardless of whether that agreement is established through direct or circumstantial evidence, the fact remains that the agreement must, in fact, be established. In this regard, Mr. Anders' testimony about some amorphous thing "just [coming] along" is patently insufficient to overcome his clear admissions that no agreement was reached between he and Dr. Bachynsky.

a new result.  See Gates,  10 F.3d at 767.  In this regard, it is of paramount importance to note that the governing standard is not that a new trial would result in an acquittal, or what effect the newly discovered evidence would have had in the context of the old trial.  Rather, the standard is whether the newly discovered evidence is "of such a nature that a new trial would probably produce a new result."  Id. (emphases added).  Here, Mr. Anders' confirmation that Dr. Bachynsky "never spoke to Ralph Klein, never," Transcript, at 09:18, in and of itself is sufficient to satisfy this standard, as Dr. Bachynsky was convicted of two substantive counts of wire fraud (Counts 9 and 10) involving Mr. Klein.  Further, Mr. Anders' testimony about Dr. Bachynsky's lack of involvement in the financial/fundraising side of the Helvetia operation, and his testimony about his and Dr. Bachynsky's disclosure of their respective criminal pasts to Richard Friedman, squarely buttresses some of the defenses that Dr. Bachynsky's trial counsel did their best to present.  Finally, as discussed above, the impact of Mr. Anders' testimony about the lack of any agreement between he and Dr. Bachynsky as it relates to the conspiracy charge against the latter cannot be overstated.  A new trial with all of this newly discovery testimony would produce – at a minimum "would probably produce" – a new result.

This trial was a lengthy and complex one.  Based on their verdict (finding Dr. Bachynsky not guilty on thirteen counts and guilty on only five) and the extreme difficulty several of them had reaching that verdict,[4] the jurors were far from convinced that Dr. Bachynsky did what the Government contended he did.  Particularly in light of these circumstances, the newly discovered

---

[4] The Court will certainly recall the fact that, when the verdict was announced and the jury was polled, various of the jurors expressed how difficult they found it in reaching the verdict – indeed, one juror was crying over the angst she experienced in doing so. See Trial Transcript, Vol. 28, at 5579:12-13 ("[THE COURT]: Mr. Yesan, was that your verdict? JUROR YESAN:  Very hard, yes."); id. at 5647:25 – 5648:05 ("THE COURT:  Let me just say, I – your observations about those two jurors is accurate.  I think Mr. Yesan did say it was difficult, or heard, something like that, before he said it was his verdict. And Ms. Altamirano had tears in her eyes when the verdict was being read and when she and the others were polled.").

8

evidence in the form of Mr. Anders' testimony would, at a minimum, "probably produce a new result," which is all that this Circuit requires in order to mandate a new trial. Dr. Bachynsky's Supplemental Motion should be granted.

### III. Mr. Anders' Denial of the Statements the Affiants Attribute to Him Also Satisfies the Standard to Warrant a New Trial

During his sworn testimony, Mr. Anders was also questioned on the contents of the affidavits of Messrs. Haber, Kopeykin, Kopeykin, Kim, and Marshall. Although Mr. Anders confirmed myriad details set forth in these five affidavits (largely corroborating their veracity),[5] he denied making the direct statements the affiants attributed to him concerning Dr. Bachynsky's innocence of the charges against him. See Transcript, at pp. 13, 17, 18, 20. Given these circumstances, the statements of the affiants – which for purposes of this Supplemental Memorandum are unquestionably accepted as true, see id. at 66:05-10 – would be admissible and relevant at any new trial for two reasons: First, these statements would be admissible as non-hearsay because they would not be admitted for the truth of the matter asserted, and second, these statements would be admissible as prior inconsistent statements. Under either scenario, a new trial is warranted.

First, the affiants' statement would be admissible, non-hearsay testimony because they would not be admitted to establish their truth, but rather for the issue of Mr. Anders' state of mind vis-à-vis Dr. Bachynsky's involvement in the Helvetia financial scheme. See Fed. R. Ev. 801(c). As explained above, Sans dictates that the state of mind of an alleged coconspirator in such a scheme is relevant as to a conspiracy charge against another alleged coconspirator. See

---

[5]   See, e.g., Transcript, at 12:07-20 (confirming Mr. Anders periodically went to the FDC law library and spoke with law clerks, as Mr. Haber stated); 14:02-16 (confirming his friendship and participation in a football pool with the Kopeykin brothers, as they had stated); 18:01-03 (confirming he met Mr. Kim while on Unit 11 West, as Mr. Kim had stated); 20:19-21 (confirming he met Mr. Marshall while on Unit 11 West, as Mr. Marshall had stated).

9

731 F.2d at 1532. And such conclusion is logical, as there is no reason why the <u>mens</u> <u>rea</u> of all individuals who are alleged to have conspired to violate the law together should not be considered in determining whether an agreement between these individuals was reached. Thus, at a new trial, Mr. Anders would deny expressing Dr. Bachynsky's lack of culpability with respect to the Helvetia charges against him, and the affiants would testify that Mr. Anders made numerous statements to each of them confirming Dr. Bachynsky's innocence of those same charges.[6] Such conflicting testimony would yield a credibility determination that would be left for the (new) jury to make. Given the circumstances, including the number of affiants and the various facts corroborating the affiants' access to and discussions with Mr. Anders during the relevant timeframe, the new jury could easily credit the affiants over Mr. Anders as to these statements. The new jury should be given the opportunity to make that determination. Thus, a new trial, with these affiants' testimony, is warranted.

Second, and in the alternative, pursuant to Federal Rule of Evidence 613, Mr. Anders' denial of the statements the affiants swear he made to them would allow the affiants to take the stand and testify about Mr. Anders' prior inconsistent statements. Those portions of Mr. Anders' testimony would thus be subject to impeachment. In this regard, various courts have held that impeachment evidence can support the granting of a new trial. <u>See</u> <u>United States v. Quiles</u>, 618 F.3d 383, 391 (3d Cir. 2010) ("District courts do not and should not ignore a claim that there has been a miscarriage of justice just because the newly discovered evidence supporting the claim could

---

[6] This scenario would not be dissimilar to the Court's admission, during Dr. Bachynsky's trial, of Special AUSA Sindler-Fuchs's testimony that Agent Andjich allegedly said to Dr. Bachynsky, "Doc, why would you want to do this? You're only gonna end up in prison again." At the earlier trial, Agent Andjich could not, like at a new trial Mr. Anders would not, provide such testimony himself. Thus, as the Court allowed Special AUSA Sindler-Fuchs to testify to what Agent Andjich allegedly had said in front of her, the Court would allow the five affiants to testify to what Mr. Anders had said in front of them. This sort of testimony was admissible in the earlier trial, and there is no reason this sort of testimony would not be admissible in a new trial.

10

be categorized as impeachment in character."); United States v. Lipowski, 423 F. Supp. 864, 867 (D.N.J. 1976) ("However, it is within the Court's power to grant a new trial if it appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different verdict."). Whichever way the testimony was introduced, the new jury would have before it Mr. Anders' various statements concerning Dr. Bachynsky's lack of involvement in the Helvetia fundraising; Dr. Bachynsky's non-concealment of his criminal past from Richard Friedman and others; Dr. Bachynsky's anger at the decision to send out the rough business plan; and Dr. Bachynsky's complete devotion to the medical side of the DNP operations. The new jury would also have Mr. Anders' denial that he told each and every one of the affiants that Dr. Bachynsky was innocent of the charges against him, and the impeachment evidence relating to that denial. The new jury would thus be faced with, and able to sift through, all of this relevant, newly discovered evidence and make the ultimate decision as to Dr. Bachynsky's guilt or innocence on the charges against him. For this reason as well, a new trial is warranted.

In the event the Court disagrees that a new trial is warranted based on the persuasive, newly discovered evidence now before it, the Court should exercise its discretion to hold a more fulsome evidentiary hearing, at which time the five affiants can be placed on the witness stand and questioned. In this manner, additional details of what Mr. Anders told each of the affiants – some of which details may prove highly impactful on the question of Dr. Bachynsky's guilt or innocence – can be fleshed out. These details could affect the Court's consideration of the credibility issues between Mr. Anders and the affiants, and thereby affect the Court's determination of whether or not, at a new trial, the newly discovered evidence "would probably produce a new result." Gates, 10 F.3d at 767. Accordingly, if the Supplemental Motion is not granted on the current record, a further evidentiary hearing should be scheduled.

### IV. Dr. Bachynsky's Right to Testify in His Own Defense, Taking Into Consideration the Impact of the Newly Discovered Evidence, Should Be Protected

Finally, it should be noted that at any new trial, with the newly discovered evidence of Mr. Anders' testimony or of Mr. Anders' <u>and</u> the affiants' testimony, Dr. Bachynsky's trial strategy would be materially changed. One aspect of that change could and likely would be whether or not Dr. Bachynsky chooses to take the stand in his own defense. This is a decision only Dr. Bachynsky can make, considering the substance and effect of the newly discovered evidence, and it is one that justice dictates he be allowed to make. The Supplemental Motion should be granted, and a new trial should be held.

### CONCLUSION

For all of the foregoing reasons, as well as those set out in the Supplemental Motion and Dr. Bachynsky's Reply Memorandum in support thereof, the Court should grant the Supplemental Motion and allow Dr. Bachynsky a new trial or, in the alternative and at a minimum, hold the Supplemental Motion in abeyance and schedule a full evidentiary hearing to further address the issues raised herein.

Respectfully submitted,

MURAI, WALD, BIONDO
& MORENO, P.A.
Court-Appointed Counsel for
Defendant Nicholas Bachynsky
1200 Ponce de Leon Boulevard
Coral Gables, Florida 33134
Telephone: (305) 444-0101
Facsimile:  (305) 444-0174


By:     s/ Allen P. Pegg         .
        Allen P. Pegg
        Fla. Bar No. 0597821

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system this 11th day of March, 2011, which will serve a serve a Notice of Electronic Filing on all counsel of record.

By: <u>    s/ Allen P. Pegg    </u> .