UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED by _____ .D.C.

JUN 2 7 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA

V.

NICHOLAS BACHYNSKY, ET AL.

Case No. 04-20250-CR-Jordan

**JOINT REQUEST OF JAMES NAPLES AND ST. JUDE PHARMACEUTICALS, INC.,
FOR RETURN OF 23 BOXES OF MATERIALS**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW James Naples (Naples) and St, Jude Pharmaceuticals, Inc. (St. Jude),[1] by and through their attorney of record, Craig L. Henry, and present this their joint request for return of 23 boxes of materials belonging to them.

1.      In October 1997 St. Jude retained the services of Nicholas Bachynsky (Bachynsky) to conduct research on health related issues.   At that time, and at all times relevant to this submission, Naples was the majority shareholder and President of St. Jude.

2.      In 1998, both Bachysnky and his significant other, Woodie Roy, conveyed their rights to a medical therapy involving the chemical known as DNP to St. Jude.  The documents included the following language regarding what Bachynsky and Roy, as sellers, conveyed to St. Jude:

> "all of Seller's books, records, papers and instruments of whatever nature and wherever located that relate to Patent Rights or which are required or are necessary in order for [St. Jude] to fully utilize the economic benefits of the Patent Rights and Invention."

*See* **Exhibit 1**.

---

[1] St. Jude Pharmaceuticals, Inc., was formerly known as Texas Pharmaceuticals, Inc. (TPI).  All references herein to St. Jude Pharmaceuticals, Inc., includes Texas Pharmaceuticals, Inc.

3.      Just prior to being terminated by St. Jude, Bachynsky stole countless documents within the scope of the aforementioned conveyance.    Bachynsky also stole various documents belonging to Naples.

4.      In early 2001, sixteen (16) boxes containing the documents that belonged to Naples and St. Jude were tendered by Bachynsky to the Federal Bureau of Investigation (FBI) in Miami. The FBI in Miami sent the sixteen (16) boxes to Federal Drug Administration (FDA) Investigator William Brannon in Austin, Texas.    After an initial review, FDA Investigator Brannon subsequently transferred some of the documents to Assistant United States Attorney Andy Williams (for potential privilege review) and the remaining documents to the FBI in Texarkana, Texas.    Ultimately, AUSA Williams tendered some of the materials sent to him by FDA Investigator Brannon to the FBI in Texarkana and withheld some of the documents as privileged.

5.      In the course of discovery associated with United States v. Naples, No. 5:04cr4(1) (and the reindictment thereof, to wit: No. 5:04cr25(1), counsel for Naples inspected all sixteen (16) boxes as well as those documents which had been extracted therefrom by AUSA Williams as privileged.  It was during this timeframe --2004-- that Naples and St. Jude confirmed what it had suspected: that Bachynsky had stolen these documents.

6.      On April 26, 2005, St. Jude filed an application for writ of sequestration for return of the documents in the 5th Judicial District Court of Bowie County, Texas.    *See* **Exhibit 2**.

7.      On April 27, 2005, the Honorable Ralph K. Burgess, 5th Judicial District Judge of Bowie County, Texas entered an order granting St. Jude's application for writ of sequestration.  *See* **Exhibit 3**.

8.      On May 25, 2005, undersigned counsel sent an email to Mr. Malcolm Bales, Chief of the Criminal Division, United States Attorney's Office for the Eastern District of Texas, inquiring whether the government would agree to give full faith and credit to the state court sequestration order by retaining possession of the sixteen (16) boxes. *See* **Exhibit 4**.

9.      On June 3, 2005, Mr. Bales responded by email and stated "[n]one of the materials…are going anywhere." *See* **Exhibit 5**.

10.     Contrary to Mr. Bales' June 3, 2005 email, it was discovered that in early July 2005, the sixteen (16) boxes of materials stolen by Bachynsky were repacked into twenty-two (22) boxes and sent by FBI Agent Susan Goldsmith (Texarkana FBI) to the FBI in Miami for discovery in this case.

11.     On July 29, 2005, immediately after learning that the sixteen (16) boxes (now repacked into twenty-two boxes) had been sent to the FBI in Miami, Naples filed his "Emergency Motion To Preserve The Status Quo Regarding Materials Stolen By Nicholas Bachynsky And Provided To The Government Pending Judicial Review Of Whether The Materials Are Protected By The Attorney-Client And/Or Work Product Privilege" in Cause No. 5:04cr25. [2]

12.     On August 22, 2005, United States District Judge David Folsom of the Eastern District of Texas, held a telephone conference hearing with Mr. Bales and undersigned counsel.  At that time, the parties agreed to the entry of an agreed order directing the sixteen (16) boxes (now repackaged into twenty-two (22) boxes) be returned from the FBI in Miami to the FBI in Texarkana upon conclusion of the Miami case.  Judge Folsom actually signed this Order on September 1, 2005, and it was filed on September 2, 2005. *See* **Exhibit 6**.

---

[2] This was a reindictment of Cause No. 5:04cr4(1), which was dismissed by Judge Folsom in May 2004 upon motion by the government.

13.     On August 23, 2005, this Court held a hearing in connection with the twenty-two (22) boxes of documents which are currently in the possession of the FBI in Miami.  During the hearing, the late Hugo Black, the AUSA handling the case at that time, stated that the government would return the "documents back to Texas .... at the conclusion of [Bachynsky's] case. *See* **Exhibit 7** at p.13. ll. 20-24.

14.     On December 9, 2005, the Honorable David Folsom, United States District Judge for the Eastern District of Texas, entered an order requiring the FBI, IRS, FDA, and any and all other federal and/or state agencies involved in the investigation and/or prosecution of Naples to return to Naples any and all documents, files, papers and or tangible items.  Said order additionally provided that, "the agencies specified above shall not retain copies of said documents or data bases containing such document and/or data derived therefore [sic]." *See* **Exhibit 8**.

15.     In early 2006, the government came into possession of a twenty-third box of documents belonging to Naples and St. Jude.  *See* Order Concerning Additional Box [D.E. 381].

16.     On June 13, 2007, this Court entered an order giving full faith and credit to the 2005 Texas state judgment which established that the 23 boxes belong to Naples and St. Jude and that Bachynsky had wrongfully appropriated them.  [D.E. 541].

17.     Undersigned counsel attempted to resolve this matter without resort to this Honorable Court.  On February 26, 2012, undersigned counsel wrote an email to AUSA Michael Davis requesting that he advise as to a date whereupon the undersigned and Naples could travel to Miami to retrieve the twenty-three boxes. *See* **Exhibit 9**.  AUSA Davis telephoned undersigned counsel and advised that he would need a couple of weeks to comply.  At the expiration of the agreed upon two week period, undersigned counsel wrote another email dated March 30, 2012 to AUSA Davis requesting that he provide a date upon which the boxes could be retrieved.  *See*

Exhibit 10. No response was forthcoming from AUSA Davis. On April 11, 2012, undersigned counsel again wrote an email to AUSA Davis requesting a date upon which the boxes could be picked up. *See* Exhibit 11. No response to this email was ever received from AUSA Davis.

WHEREFORE, PREMISES CONSIDERED, Naples and St. Jude request that the Court grant this motion and order the United States Attorney for the Southern District of Florida, Miami Division, to designate a date certain on which Naples and St. Jude may travel to Miami and obtain possession of the twenty-three boxes of materials lawfully belonging to Naples and St. Jude.

Respectfully Submitted,

CRAIG L. HENRY
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas  75504-3226
(903) 792-4645
FAX (903) 792-5073
Lawyrntx@aol.com

By: _____
Craig L. Henry
Arkansas Bar No. 90142
Oklahoma Bar No. 16779
Texas Bar No. 09479260

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2012, a true and correct copy of the foregoing was placed in the United States mail, with first-class postage prepaid, and addressed to:

Michael Davis
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 N.E. 4th Street, Suite 400
Miami, Florida 33132-2111

Craig L. Henry

**EXHIBIT 1**

**AGREEMENT FOR SALE OF INVENTION AND RELATED RIGHTS**



# AGREEMENT FOR SALE OF INVENTION AND RELATED RIGHTS

THIS AGREEMENT FOR SALE OF INVENTION AND RELATED RIGHTS (this "Agreement") is made and entered into as of March 2, 1998, by and among, NICHOLAS BACHYNSKY, whose address for the purposes of this Agreement is c/o 701 W. 14th Street, Texarkana, Bowie County, Texas 75501 (herein, "Seller"), and TEXAS PHARMACEUTICALS, INC., a Texas corporation, whose address for the purposes of this Agreement is 701 W. 14th Street, Texarkana, Bowie County, Texas 75501 (herein "Purchaser").

## F A C T S

Seller, with the financial support of James J. Naples, has been conducting medical research and developing a novel use and method of inducing intracellular hyperthermia and free radical flux through the use of dinitrophenol and other mitochondrial uncoupling agents in the treatment of infectious and malignant disease. Seller has developed and devised a therapeutic application of dinitrophenol and other mitochondrial uncoupling agents for such purposes. A description of this therapy is attached as Schedule 1 to Exhibit A to this Agreement and the matters described therein and herein are referred to herein, collectively, as the "Invention".

Seller desires to sell Seller's entire right, title and interest in and to such Invention and any and all patents and protections which may hereafter be obtained regarding the Invention (the "Patent Rights"), and Purchaser desires to purchase the Patent Rights, upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual benefits to be derived and the representations and warranties, conditions and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I

## GENERAL

1.01 Definitions.    Unless otherwise stated in this Agreement, the following terms shall have the indicated meanings (the following definitions to be equally applicable to both the singular and plural forms of any of the terms herein defined):

"Assets":   The assets, rights, interests and properties which are described in Section 1.02 (a) of this Agreement.

"Assignment":   The Assignment from Seller, as assignor, to Purchaser, as assignee, in the form attached hereto as Exhibit A.

1

10088

"Closing":   The consummation of the purchase and sale contemplated by this Agreement.

"Closing Date":   Wednesday, March 4, 1998 at 1:00 P.M., San Antonio, Texas time, or such other date and time upon which the parties may agree.

"Invention":   Seller's invention of a novel use and method of inducing intracellular hyperthermia and free radical flux through the use of dinitrophenol and other mitochondrial uncoupling agents in the treatment of infectious and malignant disease, as more fully set forth in Schedule 1 to the form of Assignment attached hereto as Exhibit A.

"Non-Competition Agreement":   The Non-Competition Agreement by and between Seller and Purchaser in the form attached hereto as Exhibit B.

"Patent Rights":   The Invention, all of Seller's rights thereunder and therein, all existing and future patent applications relating to the Invention, all patents issued with respect to the Invention, all patents to be issued with respect to the Invention, all renewals or extensions or continuations of patents or patent applications with respect to the Invention, all causes of action relating to any use of the Invention and all international rights of priority with respect to said Invention and all rights to file further applications for patent or patent-like protections for said Invention.

"Promissory Note":   The Promissory Note in the amount of $35,000.00 payable to Seller by Purchaser, evidencing a portion of the Purchase Price, in the form attached hereto as Exhibit C.

"Purchase Price":   The price to be paid by Purchaser to Seller in consideration for the sale by Seller and Purchase by Purchaser of the Assets.

"Records":   All of Seller's books, records, papers and instruments of whatever nature and wherever located that relate to the Patent Rights or which are required or necessary in order for Purchaser to fully utilize the economic benefits of the Patent Rights and Invention.

"Security Agreement":   The Security Agreement executed by Seller and Purchaser, giving and granting to Seller a lien on the Assets to secure the repayment of the Promissory Note, in the form attached hereto as Exhibit D.

"Transaction":   The sale and purchase of the Assets, assignment and assumption of certain rights and interests, and performance of the covenants, in each case as contemplated by this Agreement.

2

10089

**1.02.** Agreement To Purchase and Sell.

(a)    On and subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, transfer, assign and deliver to Purchaser, and Purchaser agrees to purchase from Seller, the Invention, Patent Rights and Records.

(b)    Seller agrees to enter into and be bound by the Non-Competition Agreement.

(c)    Seller agrees to indemnify and hold harmless Purchaser in accordance with the terms of this Agreement.

**1.03.** Purchase Price.    The Purchase Price for the Assets will be the total cash sum of TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($200,000.00).

**1.04.** Payment of Purchase Price.    The Purchase Price shall be payable to Seller by Purchaser as follows:

(a)    On or before the Closing Date, James J. Naples has paid in excess of the sum of $165,000.00 in research and testing fees to the Cancer, Research and Therapy Center in San Antonio, Texas, and to research laboratories in Syracuse, New York, to or for the benefit of Seller. It is understood and agreed that Purchaser is presently entitled to a credit against the cash consideration payable to Seller by virtue of these cash payments or obligations incurred by James J. Naples to or for the benefit of Seller prior to the date of this Agreement. Payments were made by James J. Naples prior to the date of this Agreement, and prior to the date of incorporation of Purchaser, in anticipation of this Agreement to fund the costs of research and development of the Invention.

(b)    On the Closing Date, Purchaser shall execute and deliver to Seller the Promissory Note and the Security Agreement. It is further understood and agreed that Purchaser shall be entitled to a credit against such promissory note for additional sums advanced by James J. Naples to or for the benefit of Seller to fund additional costs of research and development of the Invention.

**1.05**   No Assumption of Liabilities.    By purchase of the Assets, Purchaser takes the assets free of any claims, liens or interests of third parties, other than the liens created to secure the repayment of the Promissory Note.

**1.06**   No Proration of Taxes; Offset.    If any taxes of any kind are assessed against any of the Assets, Seller will pay such sums to the appropriate taxing authorities when due, prior to becoming delinquent, shall indemnify Purchaser for all such sums and, in addition to the indemnities hereinafter made, does give and grant to Purchaser an offset against all sums owing and unpaid under the Promissory Note for any amounts owed by Seller which Seller fails to pay.

10090

1.07  Instruments of Transfer; Further Assurances.   In order to consummate the Transaction, on the Closing Date the Seller shall deliver to Purchaser an executed and acknowledged, where applicable, original of (a) the Assignment, covering all of the Assets; and (b) the Non-Competition Agreement. At the Closing, and at all times thereafter as may be necessary, Seller agrees to execute and deliver to Purchaser such other instruments or transfers as may be reasonably necessary to vest in Purchaser good and indefeasible title to the Assets and to comply with the purposes and intent of this Agreement.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.01.  Representations and Warranties of Seller.   Seller hereby represents and warrants to Purchaser that the following matters are true and correct on the date of this Agreement and will be true and correct through the Closing Date and thereafter, as if made on and as of that date:

(a)   This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable in accordance with its terms; no person or entity other than Seller has any interest in or ownership of the Invention as of the date of this Agreement other than equitable claims of Purchaser and/or James J. Naples by virtue of sums advanced to fund the costs of research and development of the Invention.

(b)   Seller has good and indefeasible title to the Assets, free and clear of all liens and claims of third parties and no third party has any right to acquire the Assets superior to Purchaser.

(c)   There are no claims, actions, suits or proceedings pending or threatened against Seller which involve any of the Assets.

(d)   Seller has complied in all respects with all applicable laws, ordinances, regulations, statutes, rules and restrictions relating to the Assets, or any part thereof.

(e)   There is no fact known to Seller which has specific application to this Transaction or the Assets which could have a material adverse effect on the Assets, the ability of Purchaser obtaining a patent on the Invention, the title of Purchaser in and to the Assets from and after the Closing or any other matter which would adversely impact Purchaser in connection with the Assets.

(f)   Seller may execute, deliver and perform this Agreement without the necessity of Seller obtaining any consent, approval, authorization or waiver or giving notice or otherwise, except for such consents, approvals, authorizations,

4

10091

waivers and notices which have been obtained and are unconditional and such notices which have been given.

(g)   Seller has not incurred any trade payables which have not been disclosed to Purchaser and shall pay or otherwise satisfy all other claims and liabilities relating to the Assets incurred through the Closing Date.  **SELLER AGREES AND DOES HEREBY INDEMNIFY AND HOLD PURCHASER HARMLESS FROM AND AGAINST ALL CLAIMS, LOSSES, DEMANDS, DAMAGES, LIABILITIES, COSTS AND EXPENSES RESULTING FROM OR RELATING TO ANY CLAIM MADE AGAINST PURCHASER ARISING FROM SELLER'S BREACH OF THIS AGREEMENT OR ANY OF ITS TERMS, SUCH AGREEMENT TO SURVIVE THE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.**

2.02  <u>Representations and Warranties of Purchaser</u>.   Purchaser represents and warrants to Seller that the following are true and correct on the date of this Agreement and will be true and correct through the Closing Date, as if made on and as of that date:

(a)   This Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms.

(b)   Purchaser may execute, deliver and perform this Agreement without the necessity of Purchaser obtaining any consent, approval, authorization or waiver or giving notice or otherwise, except for such consents, approvals, authorizations, waivers and notices which have been obtained and are unconditional and such notices which have been given.

### ARTICLE III

### CONDITIONS OF CLOSING

3.01.  <u>Conditions Imposed by Purchaser</u>.   The obligations of Purchaser to consummate the purchase and sale under this Agreement are subject to the satisfaction of the following conditions, each of which may be waived in writing by Purchaser:

(a)   Seller shall have delivered to Purchaser the duly executed and acknowledged Assignment.

(b)   Seller shall have delivered to Purchaser the duly executed and acknowledged the Non-Competition Agreement.

(c)   Seller shall have performed the covenants, agreements and obligations necessary to be performed by Seller under this Agreement prior to the Closing Date.

5

10092

3.02. <u>Conditions Imposed by Seller</u>.   The obligations of Seller to consummate the purchase and sale under this Agreement are subject to the satisfaction of the following conditions, each of which may be waived in writing by Seller:

(a)   Purchaser shall have delivered to Seller the duly executed and acknowledged Non-Competition Agreement.

(b)   Purchaser shall have delivered to Seller the initial installment of the Purchase Price in the amount of $15,000.00, less the amount of the Purchaser's payments to Seller, or for the benefit of Seller, prior to or after the date of this Agreement, in the amount to be agreed upon by Seller and Purchaser pursuant to Section 1.04(a) of this Agreement.

(c)   Purchaser shall have delivered to Seller the Promissory Note together with the duly executed and acknowledged Security Agreement.

## ARTICLE IV

## CLOSING DATE

4.01   <u>Closing Date</u>.

(a)   Subject to the right of Seller and Purchaser to terminate this Agreement pursuant to Section 5.02. hereof, the Closing for the consummation of the purchase and sale contemplated by this Agreement will, unless another date is agreed to in writing by Seller and Purchaser, take place on the Closing Date.

(b)   For all purposes hereof, the term "<u>the Effective Time of Closing</u>" shall occur upon the delivery to Purchaser of the Assignment and the Non-Competition Agreement and the other documents as contemplated herein on the Closing Date.

## ARTICLE V

## MISCELLANEOUS

5.01. <u>Further Actions</u>.   From time to time, as and when requested by Purchaser or Seller, Seller or Purchaser shall execute and deliver, or cause to be executed and delivered, such documents and instruments and shall take, or cause to be taken, such further or other actions as may be reasonably necessary to effectuate the Transaction and transfer, assign and deliver to Purchaser, or Purchaser's assigns, the Assets (or to evidence the foregoing) and to consummate and to effect the other transactions expressly required to be performed by Seller hereunder.

5.02. <u>No Broker</u>.   Seller and Purchaser represent and warrant to the other that they have no obligation or liability to any broker or finder by reason of the transactions

10093

which are the subject of this Agreement. Each party agrees to indemnify the other party against, and to hold the other harmless from, at all times after the date hereof, any and all liabilities and expenses (including without limitation legal fees) resulting from, related to or arising out of any claim by any person for brokerage commissions or finder's fees, or rights to similar compensation, on account of services purportedly rendered on behalf of Seller or Purchaser, as the case may be, in connection with this Agreement or the transactions contemplated hereby.

5.03. _Expenses_.   Except as otherwise specifically provided herein, Seller and Purchaser shall each bear their own legal fees, accounting fees and other costs and expenses with respect to the negotiation, execution and the delivery of this Agreement and the consummation of the transactions hereunder, and Seller will pay its expenses after the Effective Time of Closing out of the Purchase Price proceeds paid by Purchaser to Seller pursuant to Section 1.04. Purchaser shall pay all sales, transfer and documentary fees or taxes incident to the sale of the Assets, if any.

5.04. _Entire Agreement_.   This Agreement and the Exhibits hereto are intended by the parties as a final expression of the entire agreement between Seller and Purchaser with respect to the transactions contemplated by this Agreement and supersede all prior oral or written agreements, arrangements or understandings with respect thereto.

5.05. _Descriptive Headings_.   The descriptive headings of this Agreement are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

5.06. _Notices_.   All notices or other communications which are required or permitted hereunder shall be in writing and shall be delivered either personally or by telegram, telex, telecopy or similar facsimile means, by registered or certified mail (postage prepaid and return receipt requested), or by express courier or delivery service, addressed to the addresses of the parties shown on page 1 of this Agreement or at such other address and number as either party shall have previously designated by written notice given to the other party in the manner hereinabove set forth. Notices shall be deemed given when received, if sent by telegram, telex, telecopy or similar facsimile means (confirmation of such receipt by confirmed facsimile transmission being deemed receipt of communications sent by telex, telecopy or other facsimile means); and when delivered and receipted for (or upon the date of attempted delivery where delivery is refused), if hand-delivered, sent by express courier or delivery service, or sent by certified or registered mail.

5.07. _GOVERNING LAW_.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS (OTHER THAN THE CHOICE OF LAW PRINCIPLES THEREOF).

10094

5.08. <u>Waivers and Amendments</u>.   Any waiver of any term or condition of this Agreement, or any amendment or supplementation of this Agreement, shall be effective only if in writing. A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive a party's rights hereunder at any time to enforce strict compliance thereafter with every term or condition of this Agreement.

5.09. <u>Illegalities</u>.   In the event that any provision contained in this Agreement shall be determined to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and the remaining provisions of this Agreement shall not, at the election of the party for whose benefit the provision exists, be in any way impaired.

5.10. <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one Agreement. Facsimiles of signatures shall be deemed as original signatures.

5.11. <u>Survival; Exclusivity of Remedies</u>.   The representations and warranties, covenants and agreements of the parties hereto shall survive the Closing.

5.12   <u>Assignment by Purchaser</u>.   Purchaser may assign Purchaser's rights under this Agreement without restriction of any kind.   Any assignee of Purchaser's rights hereunder shall succeed to all of the rights, powers, duties, benefits and obligations of Purchaser hereunder.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

PURCHASER:

TEXAS PHARMACEUTICALS, INC., a Texas corporation

BY: _____
NAME: _____
TITLE: _____

DATE: ___3/6/98_____

**[SIGNATURE OF SELLER FOLLOWS ON NEXT PAGE]**

8

10095

SELLER:

_____

NICHOLAS BACHYNSKY

STATE OF TEXAS                     §
                                   §
COUNTY OF _BEXAR_                   §

BEFORE ME, the undersigned authority, on this day personally appeared NICHOLAS BACHYNSKY known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _5th_ day of March, 1998.

> VIRGINIA OHLENBUSCH
> MY COMMISSION EXPIRES
> May 4, 2000
> (SEAL)

_Virginia Ohlenbusch_
Notary Public Signature

_Virginia Ohlenbusch_
Notary Printed Name
Commission Expires: _5-4-2000_

STATE OF TEXAS                     §
                                   §
COUNTY OF _____                  §

BEFORE ME, the undersigned authority, on this day personally appeared JAMES J. NAPLES, President of TEXAS PHARMACEUTICALS, INC., a Texas corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacity therein stated, as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _6th_ day of March, 1998.

> PATTY HAMILTON
> Notary Public
> (SEAL) State of Texas
> Commission Expires 11-9-98

_Patty Hamilton_
Notary Public Signature

_PATTY HAMILTON_
Notary Printed Name
Commission Expires: _11-9-98_

9

10096

# *AGREEMENT FOR SALE OF INVENTION AND RELATED RIGHTS*

THIS AGREEMENT FOR SALE OF INVENTION AND RELATED RIGHTS (this "Agreement") is made and entered into as of July 20, 1998, by and among, WOODIE ROY, whose address for the purposes of this Agreement is c/o 701 W. 14th Street, Texarkana, Bowie County, Texas 75501 (herein, "Seller"), and TEXAS PHARMACEUTICALS, INC., a Texas corporation, whose address for the purposes of this Agreement is 701 W. 14th Street, Texarkana, Bowie County, Texas 75501 (herein "Purchaser").

## F A C T S

Seller has assisted NICHOLAS BACHYNSKY ("Bachynsky") who, with the financial support of James J. Naples, has been conducting medical research and developing a novel use and method of inducing intracellular hyperthermia and free radical flux through the use of dinitrophenol and other mitochondrial uncoupling agents in the treatment of infectious and malignant disease. Bachynsky and Seller have developed and devised a therapeutic application of dinitrophenol and other mitochondrial uncoupling agents for such purposes. A description of this therapy is attached as Schedule 1 to Exhibit A to this Agreement and the matters described therein and herein are referred to herein, collectively, as the "Invention".

Seller desires to sell Seller's entire right, title and interest in and to such Invention and any and all patents and protections which may hereafter be obtained regarding the Invention (the "Patent Rights"), and Purchaser desires to purchase the Patent Rights, upon the terms and conditions hereinafter set forth. Bachynsky has previously assigned his entire right, title and interest in and to such Invention and any and all patents and protections which may hereafter be obtained regarding the Invention to Purchaser.

NOW, THEREFORE, in consideration of the mutual benefits to be derived and the representations and warranties, conditions and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I

### GENERAL

1.01    Definitions. Unless otherwise stated in this Agreement, the following terms shall have the indicated meanings (the following definitions to be equally applicable to both the

1

10124

singular and plural forms of any of the terms herein defined):

"Assets":      The assets, rights, interests and properties which are described in Section 1.02 (a) of this Agreement.

"Assignment":  The Assignment from Seller, as assignor, to Purchaser, as assignee, in the form attached hereto as Exhibit A.

"Closing":     The consummation of the purchase and sale contemplated by this Agreement.

"Closing Date":     Tuesday, July 21, 1998 at 11:00 A.M., San Antonio, Texas time, or such other date and time upon which the parties may agree.

"Invention":   Seller's invention of a novel use and method of inducing intracellular hyperthermia and free radical flux through the use of dinitrophenol and other mitochondrial uncoupling agents in the treatment of infectious and malignant disease, as more fully set forth in Schedule 1 to the form of Assignment attached hereto as Exhibit A.

"Non-Competition Agreement":  The Non-Competition Agreement by and between Seller and Purchaser in the form attached hereto as Exhibit B.

"Patent Rights":    The Invention, all of Seller's rights thereunder and therein, all existing and future patent applications relating to the Invention, all patents issued with respect to the Invention, all patents to be issued with respect to the Invention, all renewals or extensions or continuations of patents or patent applications with respect to the Invention, all causes of action relating to any use of the Invention and all international rights of priority with respect to said Invention and all rights to file further applications for patent or patent-like protections for said Invention.

"Purchase Price":   The price to be paid by Purchaser to Seller in consideration for the sale by Seller and Purchase by Purchaser of the Assets.

"Records":     All of Seller's books, records, papers and instruments of whatever nature and wherever located that relate to the Patent Rights or which are required or necessary in order for Purchaser to fully utilize the economic benefits of the Patent Rights and Invention.

"Stock Warrant" means the Stock Warrant to be tendered by Purchaser to Seller as a portion of the Purchase Price, in the form as set forth on Exhibit C attached hereto and made a part hereof for all purposes.

2

10125

"Transaction":   The sale and purchase of the Assets, assignment and assumption of certain rights and interests, and performance of the covenants, in each case as contemplated by this Agreement.

1.02.    Agreement To Purchase and Sell.

(a)  On and subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, transfer, assign and deliver to Purchaser, and Purchaser agrees to purchase from Seller, the Invention, Patent Rights and Records.

(b)  Seller agrees to enter into and be bound by the Non-Competition Agreement.

(c)  Seller agrees to indemnify and hold harmless Purchaser in accordance with the terms of this Agreement.

1.03.    Purchase Price.    TEN DOLLARS ($10.00) and other good and valuable consideration, as described below.

1.04.    Payment of Purchase Price.   The Purchase Price shall be payable to Seller by Purchaser as follows:

(a)  On or before the Closing Date, James J. Naples has paid in excess of the sum of $165,000.00 in research and testing fees to the Cancer Therapy and Research Center in San Antonio, Texas, and to research laboratories in Syracuse, New York, to or for the benefit of Seller and for other purposes related to such research and testing and for development of the patent application covering the Invention.   It is understood and agreed that Purchaser is presently entitled to a credit against the cash consideration payable to Seller by virtue of these cash payments or obligations incurred by James J. Naples to or for the benefit of Seller and/or the Invention prior to the date of this Agreement.   Payments were made by James J. Naples prior to the date of this Agreement, and prior to the date of incorporation of Purchaser, in anticipation of this Agreement to fund the costs of research and development of the Invention.

(b)  Prior to the Closing Date and to the incorporation of Purchaser, James J. Naples has, from time to time, advanced monies for the benefit of Seller; it is understood and agreed that Purchaser is presently entitled to a credit against the cash consideration payable to Seller by virtue of these cash payments or obligations incurred by James J. Naples to or for the benefit of Seller prior to the date of this Agreement.

(c) On the Closing Date, Purchaser will deliver to Seller a stock warrant authorizing Seller to purchase, for par value of $0.01, 250,000 shares of common stock in Purchaser, being twenty-five percent (25%) of the total issued and outstanding stock in

3

Purchaser, in the form and upon the terms set forth in <u>Exhibit c</u>.

1.05.    <u>No Assumption of Liabilities</u>. By purchase of the Assets, Purchaser takes the assets free of any claims, liens or interests of third parties.

1.06    <u>No Proration of Taxes; Offset</u>.   If any taxes of any kind are assessed against any of the Assets, Seller will pay such sums to the appropriate taxing authorities when due, prior to becoming delinquent, shall indemnify Purchaser for all such sums and, in addition to the indemnities hereinafter made, does give and grant to Purchaser an offset against all sums owing and unpaid under the Promissory Note for any amounts owed by Seller which Seller fails to pay.

1.07 <u>Instruments of Transfer; Further Assurances</u>. In order to consummate the Transaction, on the Closing Date the Seller shall deliver to Purchaser an executed and acknowledged, where applicable, original of (a) the Assignment, covering all of the Assets; and (b) the Non-Competition Agreement. At the Closing, and at all times thereafter as may be necessary, Seller agrees to execute and deliver to Purchaser such other instruments or transfers as may be reasonably necessary to vest in Purchaser good and indefeasible title to the Assets and to comply with the purposes and intent of this Agreement.

## ARTICLE II

<u>REPRESENTATIONS AND WARRANTIES</u>

2.01.    <u>Representations and Warranties of Seller</u>.   Seller hereby represents and warrants to Purchaser that the following matters are true and correct on the date of this Agreement and will be true and correct through the Closing Date and thereafter, as if made on and as of that date:

(a)  This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable in accordance with its terms; no person or entity other than Seller has any interest in or ownership of the Invention as of the date of this Agreement other than equitable claims of Purchaser and/or James J. Naples by virtue of sums advanced to fund the costs of research and development of the Invention.

(b)  Seller has good and indefeasible title to the Assets, free and clear of all liens and claims of third parties and no third party has any right to acquire the Assets superior to Purchaser.

(c) There are no claims, actions, suits or proceedings pending or threatened against Seller which involve any of the

4

10127

Assets.

(d)   Seller has complied in all respects with all applicable laws, ordinances, regulations, statutes, rules and restrictions relating to the Assets, or any part thereof.

(e)   There is no fact known to Seller which has specific application to this Transaction or the Assets which could have a material adverse effect on the Assets, the ability of Purchaser obtaining a patent on the Invention, the title of Purchaser in and to the Assets from and after the Closing or any other matter which would adversely impact Purchaser in connection with the Assets.

(f)   Seller may execute, deliver and perform this Agreement without the necessity of Seller obtaining any consent, approval, authorization or waiver or giving notice or otherwise, except for such consents, approvals, authorizations, waivers and notices which have been obtained and are unconditional and such notices which have been given.

(g)   Seller has not incurred any trade payables which have not been disclosed to Purchaser and shall pay or otherwise satisfy all other claims and liabilities relating to the Assets incurred through the Closing Date. **SELLER AGREES AND DOES HEREBY INDEMNIFY AND HOLD PURCHASER HARMLESS FROM AND AGAINST ALL CLAIMS, LOSSES, DEMANDS, DAMAGES, LIABILITIES, COSTS AND EXPENSES RESULTING FROM OR RELATING TO ANY CLAIM MADE AGAINST PURCHASER ARISING FROM SELLER'S BREACH OF THIS AGREEMENT OR ANY OF ITS TERMS, SUCH AGREEMENT TO SURVIVE THE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.**

2.02   <u>Representations and Warranties of Purchaser</u>. Purchaser represents and warrants to Seller that the following are true and correct on the date of this Agreement and will be true and correct through the Closing Date, as if made on and as of that date:

(a)   This Agreement and the Stock Warrant constitute the legal, valid and binding obligations of Purchaser, enforceable in accordance with their terms.

(b)   Purchaser may execute, deliver and perform this Agreement without the necessity of Purchaser obtaining any consent, approval, authorization or waiver or giving notice or otherwise, except for such consents, approvals, authorizations, waivers and notices which have been obtained and are unconditional and such notices which have been given.

(c)   Purchaser may execute, deliver and perform the Stock Warrant without the necessity of Purchaser obtaining any consent, approval, authorization or waiver or giving notice or otherwise, except such of the foregoing which have been given.

5

10128

## ARTICLE III

### CONDITIONS OF CLOSING

3.01.  <u>Conditions Imposed by Purchaser</u>.  The obligations of Purchaser to consummate the purchase and sale under this Agreement are subject to the satisfaction of the following conditions, each of which may be waived in writing by Purchaser:

(a)  Seller shall have delivered to Purchaser the duly executed and acknowledged Assignment.

(b)  Seller shall have delivered to Purchaser the duly executed and acknowledged the Non-Competition Agreement.

(c)  Seller shall have performed the covenants, agreements and obligations necessary to be performed by Seller under this Agreement prior to the Closing Date.

## ARTICLE IV

### CLOSING DATE

4.01.  <u>Closing Date</u>.

(a)  Subject to the right of Seller and Purchaser to terminate this Agreement pursuant to Section 5.02. hereof, the Closing for the consummation of the purchase and sale contemplated by this Agreement will, unless another date is agreed to in writing by Seller and Purchaser, take place on the Closing Date.

(b)  For all purposes hereof, the term "<u>the Effective Time of Closing</u>" shall occur upon the delivery to Purchaser of the Assignment and the Non-Competition Agreement and the other documents as contemplated herein on the Closing Date.

## ARTICLE V

### MISCELLANEOUS

5.01.  <u>Further Actions</u>.  From time to time, as and when requested by Purchaser or Seller, Seller or Purchaser shall execute and deliver, or cause to be executed and delivered, such documents and instruments and shall take, or cause to be taken, such further or other actions as may be reasonably necessary to effectuate the Transaction and transfer, assign and deliver to Purchaser, or Purchaser's assigns, the Assets (or to evidence the foregoing) and to consummate and to effect the other transactions expressly required to be performed by Seller hereunder.

5.02.  <u>No Broker</u>.  Seller and Purchaser represent and

6

10129

warrant to the other that they have no obligation or liability to any broker or finder by reason of the transactions which are the subject of this Agreement. Each party agrees to indemnify the other party against, and to hold the other harmless from, at all times after the date hereof, any and all liabilities and expenses (including without limitation legal fees) resulting from, related to or arising out of any claim by any person for brokerage commissions or finder's fees, or rights to similar compensation, on account of services purportedly rendered on behalf of Seller or Purchaser, as the case may be, in connection with this Agreement or the transactions contemplated hereby.

5.03.   Expenses.   Except as otherwise specifically provided herein, Seller and Purchaser shall each bear their own legal fees, accounting fees and other costs and expenses with respect to the negotiation, execution and the delivery of this Agreement and the consummation of the transactions hereunder.

5.04.   Entire Agreement.   This Agreement and the Exhibits hereto are intended by the parties as a final expression of the entire agreement between Seller and Purchaser with respect to the transactions contemplated by this Agreement and supersede all prior oral or written agreements, arrangements or understandings with respect thereto.

5.05.   Descriptive Headings.   The descriptive headings of this Agreement are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

5.06.   Notices.   All notices or other communications which are required or permitted hereunder shall be in writing and shall be delivered either personally or by telegram, telex, telecopy or similar facsimile means, by registered or certified mail (postage prepaid and return receipt requested), or by express courier or delivery service, addressed to the addresses of the parties shown on page 1 of this Agreement or at such other address and number as either party shall have previously designated by written notice given to the other party in the manner hereinabove set forth. Notices shall be deemed given when received, if sent by telegram, telex, telecopy or similar facsimile means (confirmation of such receipt by confirmed facsimile transmission being deemed receipt of communications sent by telex, telecopy or other facsimile means); and when delivered and receipted for (or upon the date of attempted delivery where delivery is refused), if hand-delivered, sent by express courier or delivery service, or sent by certified or registered mail.

5.07.   GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS (OTHER THAN THE CHOICE OF LAW PRINCIPLES THEREOF).

10130

5.08.   <u>Waivers and Amendments</u>.   Any waiver of any term or condition of this Agreement, or any amendment or supplementation of this Agreement, shall be effective only if in writing.  A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive a party's rights hereunder at any time to enforce strict compliance thereafter with every term or condition of this Agreement.

5.09.   <u>Illegalities</u>.  In the event that any provision contained in this Agreement shall be determined to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and the remaining provisions of this Agreement shall not, at the election of the party for whose benefit the provision exists, be in any way impaired.

5.10.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one Agreement.   Facsimiles of signatures shall be deemed as original signatures.

5.11.   <u>Survival; Exclusivity of Remedies</u>.  The representations and warranties, covenants and agreements of the parties hereto shall survive the Closing.

5.12   <u>Assignment by Purchaser</u>. Purchaser   may   assign Purchaser's rights under this Agreement without restriction of any kind.  Any assignee of Purchaser's rights hereunder shall succeed to all of the rights, powers, duties, benefits and obligations of Purchaser hereunder.

IN  WITNESS  WHEREOF,  the  undersigned  have  executed  this Agreement as of the date first above written.

PURCHASER:

TEXAS PHARMACEUTICALS, INC., a Texas corporation

BY: _____

NAME: _____JAMES J. NAPLES_____

TITLE: _____PRESIDENT_____

SELLER:

_____  7.24.98

WOODIE ROY

8

10131

STATE OF TEXAS     §
                   §
COUNTY OF _Bowie_   §

    BEFORE ME, the undersigned authority, on this day personally appeared WOODIE ROY known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _24th_ day of _____July_____, 1998.

                              _Patricia M. Reynolds_
                              Notary Public Signature



                              _PATRICIA M. REYNOLDS_
                              Notary Printed Name
                              Commission Expires: _9/9/99_

STATE OF TEXAS     §
                   §
COUNTY OF _Bowie_   §

    BEFORE ME, the undersigned authority, on this day personally appeared JAMES J. NAPLES, President of TEXAS PHARMACEUTICALS, INC., a Texas corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacity therein stated, as the act and deed of said corporation.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _24th_ day of _____July_____, 1998.

                              _Patty Hamilton_
                              Notary Public Signature

                              _PATTY HAMILTON_
                              Notary Printed Name
                              Commission Expires: _11-9-98_

10132

**EXHIBIT 2**


**APPLICATION FOR WRIT OF SEQUESTRATION – BOWIE COUNTY, TEXAS**

COPY

No. 05C0695-005

FILED FOR RECORD

2005 APR 26  PM 4:42

BILLY FOX
DISTRICT CLERK BOWIE CO TX

ST. JUDE PHARMACEUTICALS, INC.      IN THE DISTRICT COURT  DEPUTY
and JAMES J. NAPLES

vs.                           OF

NICHOLAS BACHYNSKY           BOWIE COUNTY, TEXAS

## APPLICATION FOR WRIT OF SEQUESTRATION

TO THE HONORABLE JUDGE OF SAID COURT:

ST. JUDE PHARMACEUTICALS, INC. (formerly known as Texas Pharmaceuticals, Inc.) and JAMES J. NAPLES, Plaintiffs in the above-entitled and numbered cause, applies to the Court for an order directing issuance of a writ of sequestration, and as grounds for such motion shows the following:

### I.

By their original petition filed simultaneously with this pleading, Plaintiffs seek judgment establishing that they are the owners of certain personal property and have superior right to possession of said property as against the Defendant.

### II.

The property made the subject of this suit is described as sixteen (16) boxes of written documents containing:

(a)     research materials generated while NICHOLAS BACHYNSKY was employed by ST. JUDE PHARMACEUTICALS, INC.;

(b)     copies of letters written to and from ST. JUDE PHARMACEUTICALS, INC.;

(c)     copies of letters written to and from JAMES J. NAPLES;

I

(d)    copies of E-Mails written to and from ST. JUDE PHARMACEUTICALS, INC.;

(e)    copies of the work-product of attorneys representing ST. JUDE PHARMACEUTICALS, INC.;

(f)    copies of the work-product of attorneys representing JAMES J. NAPLES;

(g)    copy of the JAMES J. NAPLES irrevocable trust to his children;

(h)    copies of correspondence between the Bank of Arkansas and JAMES J. NAPLES;

(i)    various stock certificates belonging to JAMES J. NAPLES;

(j)    copies of various deeds and appraisals belonging to JAMES J. NAPLES; and

(k)    other documents belonging to either ST. JUDE PHARMACEUTICALS, INC. or JAMES J. NAPLES.

The property is currently in possession of the Federal Bureau of Investigation and is located in Bowie County, Texas.

### III.

There is an immediate danger that NICHOLAS BACHYNSKY, Defendant herein, will conceal or destroy the property or remove the property out of the limits of this county during the pendency of this suit in that NICHOLAS BACHYNSKY either gave said property to the Federal Bureau of Investigation or it was seized from him. The underlying federal litigation in which the property came into possession of the federal government has concluded and it is believed that NICHOLAS BACHYNSKY will request that said property be returned to his possession.

WHEREFORE, Plaintiffs request the court to order the Clerk to issue a writ of sequestration for the property, and to fix the amount of the sequestration bond.

Respectfully submitted,

CRAIG L. HENRY
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas 75504-3226
(903) 792-4645
FAX-(903) 792-5073


By _____
CRAIG L. HENRY
Texas Bar # 09479260
Arkansas Bar # 90142
Oklahoma Bar # 016779
ATTORNEY FOR PLAINTIFFS


## VERIFICATION

STATE OF TEAXS

COUNTY OF BOWIE

    BEFORE ME, the undersigned Notary Public, on this day personally appeared James J. Naples, who being by me duly sworn on his oath deposed and said that he is one of the Plaintiffs in the above-entitled and numbered cause; that he has read the above and foregoing Application for Writ of Sequestration and that every statement contained therein is within his personal knowledge and is true and correct.


_____
James J. Naples

3

SUBSCRIBED AND SWORN TO BEFORE ME on the 16TH day of April, 2005, to certify which witness my hand and seal.

KYLE B. DAVIS
Notary Public, State of Texas
My Commission Expires
September 24, 2005

_____
Notary Public in and for Bowie
County, Texas

4

**EXHIBIT 3**

**ORDER OF SEQUESTRATION – BOWIE COUNTY, TEXAS**

No. 05C0695-005

2005 APR 27 AM 9: 56

ST. JUDE PHARMACEUTICALS, INC.
and JAMES J. NAPLES

IN THE DISTRICT COURT

vs.

OF

NICHOLAS BACHYNSKY

BOWIE COUNTY, TEXAS

## ORDER

On this day, the sworn application of James J. Naples, one of the Plaintiffs in this cause, for sequestration of certain property was presented this day, ex parte.  After considering the pleadings and other papers on file with the Court, the evidence presented and the argument of counsel, the Court finds and concludes that Plaintiffs are entitled to a writ of sequestration as requested, and that issuance of the writ without notice to the Defendant or prior hearing is justified in the circumstances for the reason that there is immediate danger that the Defendant will dispose of or destroy the property.

IT IS, THEREFORE, ORDERED that the clerk shall issue a writ of sequestration which commands the sheriff or constable of any county of the State of Texas to forthwith take into his possession the following property described as sixteen (16) boxes of written documents containing:

(a)     research materials generated while NICHOLAS BACHYNSKY was employed by ST. JUDE PHARMACEUTICALS, INC. (formerly known as Texas Pharmaceuticals, Inc.);

(b)     copies of letters written to and from ST. JUDE PHARMACEUTICALS, INC. (formerly known as Texas Pharmaceuticals, Inc.);

(c)     copies of letters written to and from JAMES J. NAPLES;

1

(d)    copies of E-Mails written to and from ST. JUDE PHARMACEUTICALS, INC. (formerly known as Texas Pharmaceuticals, Inc.);

(e)    copies of the work-product of attorneys representing ST. JUDE PHARMACEUTICALS, INC. (formerly known as Texas Pharmaceuticals, Inc.);

(f)    copies of the work-product of attorneys representing JAMES J. NAPLES;

(g)    copy of the JAMES J. NAPLES irrevocable trust to his children;

(h)    copies of correspondence between the Bank of Arkansas and JAMES J. NAPLES;

(i)    various stock certificates belonging to JAMES J. NAPLES;

(j)    copies of various deeds and appraisals belonging to JAMES J. NAPLES; and

(k)    other documents belonging to either ST. JUDE PHARMACEUTICALS, INC. (formerly known as Texas Pharmaceuticals, Inc.) or JAMES J. NAPLES, if it is found in his county, and shall deliver same to the attorney for Plaintiffs who shall keep said property subject to further order of this Court.

IT IS FURTHER ORDERED that this order shall not be effective unless and until James J. Naples executes and files with the clerk a bond, in conformity with the law, in the amount of $ *10,000 ⁰⁰*.

SIGNED this *27ʰ* day of April, 2005.

*Ralph K. Burgess*
JUDGE PRESIDING

A CERTIFIED COPY
ATTEST: BILLY FOX
District Clerk, Bowie County, Texas
*August 15* 20*05*
BY *Jill Robinson*
Deputy
VOL _____ PAGE _____

2

**EXHIBIT 4**


**MAY 25, 2005 EMAIL TO**

**CHIEF OF CRIMINAL DIVISION – EASTERN DISTRICT OF TEXAS**

Subj:    **Naples**
Date:    5/25/2005 5:01:09 P.M. Central Standard Time
From:    Lawyr n TX
To:    malcolm.bales@usdoj.gov

Malcolm:

   I have talked with Dr. Naples regarding your concerns about returning all items taken during execution of the search warrants in the exact order they were in at the time they were seized. Dr. Naples advises that he does not in fact expect the government to go back through the documents and rearrange them. He will accept the documents in the order they are in presently.

   As you are aware, Agent Goldsmith did not return all automobile titles as previously requested. While I am not immediately concerned with most of the titles she retained, I would like to obtain the title to the 2000 Cadillac Escalade, VIN 1GYEK63R6YR168546 as the dealership contacts me at least once a week requesting this title. Please see if you can have this title returned to my office.

   Finally, please advise as to whether the government will voluntarily agree to retain possession of the 16 boxes of Bachynsky documents and deliver them to my office at the appropriate time pursuant to the writ I obtained in the 5th Judicial District Court of Bowie County, Texas. I am very concerned that Agent Goldsmith will ship these documents back to Bachynsky. If necessary, I will file an appropriate motion with Judge Folsom.

   Hope all is well.

Craig Henry

Wednesday, May 25, 2005 America Online: Lawyr n TX

**EXHIBIT 5**

**JUNE 3, 2005 EMAIL FROM**

**CHIEF OF CRIMINAL DIVISION – EASTERN DISTRICT OF TEXAS**

Subj:    **RE: Naples**
Date:    6/3/2005 1:13:32 P.M. Central Standard Time
From:    Malcolm.Bales@usdoj.gov
To:      LawyrnTX@aol.com

Craig-
I have written the FBI today and requested the rest of the titles to be returned to you post haste.  None of the
materials in the basement are going anywhere.  Hope you are well.  Malcolm

Have a great day!


-----Original Message-----
From: LawyrnTX@aol.com [mailto:LawyrnTX@aol.com]
Sent: Wednesday, May 25, 2005 5:01 PM
To: Bales, Malcolm
Subject: Naples


Malcolm:

    I have talked with Dr. Naples regarding your  concerns about returning
all items taken during execution of the search  warrants in the exact order they
were in at the time they were seized.  Dr. Naples advises that he does not
in fact expect the government to go back through  the documents and rearrange
them.  He will accept the documents in the  order they are in presently.

    As you are aware, Agent Goldsmith did not return  all automobile titles
as previously requested.  While I am not immediately  concerned with most of
the titles she retained, I would like to obtain the title  to the 2000 Cadillac
Escalade, VIN 1GYEK63R6YR168546 as the dealership contacts  me at least once a
week requesting this title.  Please see if you can have  this title returned
to my office.

    Finally, please advise as to whether the  government will voluntarily
agree to retain possession of the 16  boxes of Bachynsky documents and deliver
them to my office at the appropriate  time pursuant to the writ I obtained in
the 5th Judicial District Court of Bowie  County, Texas.  I am very concerned
that Agent Goldsmith will ship these  documents back to Bachynsky.  If
necessary, I will file an appropriate  motion with Judge Folsom.

    Hope all is well.

Craig Henry

**EXHIBIT 6**

**SEPTEMBER 1, 2005 ORDER OF JUDGE DAVID FOLSOM**

**UNITED STATES DISTRICT JUDGE – EASTERN DISTRICT OF TEXAS**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

UNITED STATES OF AMERICA   §
                      §
VS.                          §     NO. 5:04cr25(1)
                      §
JAMES NAPLES         §

## ORDER

    Came on to be heard Defendant Naples' "Emergency Motion To Preserve The Status Quo Regarding Materials Stolen By Nicholas Bachynsky And Provided To The Government Pending Judicial Review Of Whether The Materials Are Protected By The Attorney-Client And/Or Work Product Privileges" (Document 107-1), filed on July 29, 2005.

    The Court has considered the Motion and held a telephone conference regarding the same on Monday, August 22, 2005. Pursuant to the agreement reached by Mr. Malcolm Bales and Mr. David Botsford, the Court enters this order.

    It is HEREBY ORDERED, ADJUDGED AND DECREED that the sixteen (16) boxes of materials previously being held by the Government in the basement of the United States Courthouse in Texarkana, Texas, which were the subject to Naples' July 29, 2005, "Emergency Motion" (Document 107-1), which sixteen (16) boxes were repackaged into twenty-two (22) boxes and transmitted by FBI Special Agent Susan Goldsmith to the FBI in Miami in early July 2005, shall be returned by the FBI in Miami to the FBI in Texarkana, Texas, at the conclusion of that certain criminal case styled United States v. Richard Anders et. al, Cause No. 04-20250-CR-Jordan/Brown, United States District Court, Southern District of Florida. In this regard, it is the Court's intention that these twenty-two (22) boxes be returned when there is no longer any appropriate reason or need for the Government to maintain them in Miami for utilization in connection with United States v. Richard Anders et. al, Cause No. 04-20250-CR-Jordan/Brown. It is the further understanding of the Court, based on Mr. Bales' representations during the August 22, 2005, conference call, that FBI Special Agent Goldsmith has "checked out" the twenty-two (22) boxes and that she remains responsible for their return to evidence in Texarkana in this case. Accordingly, Special Agent

Goldsmith is hereby ORDERED to ensure the return of said twenty-two (22) boxes and to notify Mr. Bales and counsel for James Naples, i.e., either Mr. David Botsford and/or Mr. Craig Henry, of the return of said twenty-two (22) boxes. Upon the return of said twenty-two (22) boxes to Texarkana, they shall be released to James Naples by Special Agent Goldsmith, in coordination with Mr. Bales, Mr. Botsford and/or Mr. Henry.

SIGNED this 1st day of Sept. , 2005.

DAVID FOLSOM
UNITED STATES DISTRICT JUDGE

**EXHIBIT 7**

**AUGUST 23, 2005 TRANSCRIPT OF HEARING**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,   . Case No. 04-20250-CR-Jordan
                            .
            Plaintiff,      . Miami, Florida
                            . August 23, 2005
            v.              . 10:13 a.m.
                            .
NICHOLAS BACHYNSKY, ET AL., .
                            .
            Defendants.     .
. . . . . . . . . . . . . . .

                  - - - - -
        Transcript of Motion Hearing had
    before the Honorable Adalberto Jordan,
         United States District Judge.
                  - - - - -

AUGUST 23, 2005

Proceedings recorded by mechanical stenography, transcript

produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER

(305)523-5568

4d26662a-4485-4d8a-ab78-980cba43f870

```
APPEARANCES:
For the Government:   Hugo Black
                     Jeffrey Cox
                     Assistant U.S. Attorneys
                     99 N.E. 4th Street
                     Miami, Florida  33132


For the Defendant    Allan J. Sullivan, Esq.
Anders:              Baker & McKenzie
                     1401 Brickell Avenue
                     Miami, Florida  33131
                               and
                     Allan B. Kaiser, Esq.
                     Diaz & Kaiser
                     100 SE 2nd Street
                     2600 Bank of America Tower
                     Miami, Florida  33131
                               and
                     Jose M. Quinon, Esq.
                     1401 Brickell Avenue, Suite 1000
                     Miami, Florida  33131
For the Defendant    Marco Beaton, Esq.
Bachynsky:           Howard M. Srebnick, Esq.
                     Black Srebnick Kornspan & Stumpf
                     201 S. Biscayne Boulevard, Suite 1300
                     Miami, Florida  33131
For Dr. Naples:      David L. Botsford
                     1307 West Avenue
                     Austin, Texas  78701
For the Defendant    Richard A. Moore, Esq.
Dean:                One NE 2nd Ave., Ste. 200
                     Miami, Florida 33132-2507
For Fulbright &      William R. Pakalka, Esq.
Jaworski, LLP:       Fulbright Tower
                     1301 McKinney, Suite 5100
                     Houston, TX 77010-3095


For St. Jude's       Craig L. Henry, Esq.
Pharmaceutical,      723 Main Street
Inc.:                Texarkana, TX  75501


Court Reporter:      Francine C. Salopek, RMR, CRR
                     Official Court Reporter
                     301 North Miami Avenue, Room 804
                     Miami, Florida  33128-7709
            FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
                        (305)523-5568
```

4d26662a-4485-4d8a-ab78-980cba43f870

1    defense actually -- neither us or the defense has ever looked

2    at the boxes.

3              We -- at one point, we -- actually, first, they

4    were just made available in Texarkana.  Mr. Srebnick asked if

5    we would send them here to facilitate his review of the

6    documents.  We immediately did that, and advised him of that.

7    They were not looked at.  Then this issue has arisen.

8              With regard to -- and it seems -- certainly, the

9    government has no interest in private documents.  We have no

10   problem with those being pulled.  A log can be looked at to

11   see if either the defendants or us would be interested in

12   those documents.

13             Likewise, with attorney-client privilege, you know,

14   we don't have a right to look at them and we don't have a

15   problem with that.  And work product, same thing.  Unless

16   there's some -- you know, a real strong reason that either us

17   or the defense would look at it, it seems like a log would be

18   the best way to go, the classic way these things are handled.

19             And the DNP, I also think that probably, from our

20   review of the documents, that seems like a fair thing.  We

21   don't have a problem with having restrictions on copies and

22   logging, and then getting the documents back to Texas.

23             Just the only thing in terms of an order, just --

24   the conclusion of the case, just -- if they are -- if there

25   are documents that do -- we normally hold on to our evidence

1   in our cases, Judge, just so you're aware, it's not just

2   through sentencing or appeal, but we usually hold on through

3   at least the 2255 period, so....

4           Oh -- excuse -- okay.  Mr. Cox is correcting me

5   that I said from our review of the documents.  We did not --

6   we have not -- just to be clear, we have not opened those

7   boxes.  Like I said, it didn't sound like they were really

8   relevant to us.  But until -- if the defense is going to look

9   at them, you know, we would obviously want to be not -- if

10  there's things -- and potentially, there's something in there

11  that could be helpful to us, I guess we would want to look at

12  them.  If the defense is going to crack open the boxes, we're

13  obviously going to want to crack open the boxes, too.

14          That's it, basically, Judge.

15          THE COURT:  Okay.  Thank you, Mr. Black.

16          Mr. Srebnick.

17          MR. SREBNICK:  Good morning, Judge.

18          THE COURT:  Good morning.

19          MR. SREBNICK:  We're certainly one-third of the way

20  there, as we do not have any interest in Dr. Naples's

21  personal, private materials, and I'm satisfied that I can

22  entrust that job to Attorney Botsford, as an officer of the

23  Court, to identify those matters which are truly personal,

24  private, irrelevant, have nothing to do with DNP.  So, we

25  certainly can resolve that one out of three category right

**EXHIBIT 8**

**DECEMBER 9, 2005 ORDER OF UNITED STATES JUDGE DAVID FOLSOM**

**EASTERN DISTRICT OF TEXAS**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 5:04-CR-25 |
| | § | |
| JAMES NAPLES | § | |

## ORDER

Came for consideration the emergency motion to enforce prior order filed by Defendants Naples and New Boston General Hospital, Inc., as well as the Government's Response, and the Court, after considering same, is of the opinion that said motion should be granted.

Accordingly, it is ORDERED, ADJUDGED and DECREED that the Federal Bureau of Investigation, the Internal Revenue Service, the Food and Drug Administration, and any and all other federal and/or state agencies involved in the investigation and/or prosecution of this case, return to Defendants any and all documents, files, papers and/or tangible items (including computers, computer hard drive images, and computer printouts therefore), seized pursuant to federal search warrants executed on November 1, 2001 or obtained by grand jury subpoena. The agencies specified above shall not retain copies of said documents or data bases containing such documents and/or data derived therefore. However, to insure that James Naples and/or his attorney are the appropriate recipients and custodians for the returned property, they will provide AUSA John M. Bales with releases from counsel for the other affected podiatrists, Linda Velvin, and the executrix for the Greenspan estate, before December 23, 2005. Dr. James Naples is authorized to bring a paper shredding machine on the premises of the Courthouse for the purpose of shredding those documents he does not wish to actually transport from the Courthouse. Additionally, Dr.

James Naples is authorized and will be permitted to shred all documents previously designated as trial exhibits

In no event will the Government be required to reimburse James Naples for any expenses related to the return of the seized material.

The items specified above shall be returned to the Defendants as directed, no later than the 30th day of December, 2005.

David Folsom
United States District Judge
Dec. 9, 2005

**EXHIBIT 9**


**FEBRUARY 26, 2012 EMAIL TO AUSA MICHAEL DAVIS**

| | |
|---|---|
| **Subj:** | **United States v. Nicholas Bachynsky - 22-23 boxes documents St. Jude's** |
| **Date:** | 2/26/2012 7:53:47 P.M. Central Daylight Time |
| **From:** | LawyrnTX@aol.com |
| **To:** | Michael.Davis2@usdoj.gov |

Dear Mr. Davis:

It appears that the Bachynsky case has now concluded and the issue for return of the 22-23 boxes of documents belonging to St. Jude's Pharmaceuticals is now ripe for resolution. Towards that end I have enclosed copies of the relevant orders of the court for your review. We would like to travel to Miami and personally retrive the documents. Please advise as to a convenient date we might obtain the documents.



Craig L. Henry
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas 75504-3226
(903) 792-4645 telephone
(903) 792-5073 facsimile

**\* \* \* \* \* \* \* \* \* \* NOTICE \* \* \* \* \* \* \* \* \* \* \***

The information contained in this communication is a transmission from Craig L. Henry, Attorney at Law, and is information protected by the attorney/client and/or attorney/work product privilege. It, along with any attachments hereto, is also covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2512. It is intended only for the personal and confidential use of the recipient/s named in the communication, and the privileges are not waived by virtue of this having been sent by electronic mail. If the person actually receiving this communication or any other reader of the communication is not the named recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (please call collect) and delete the original message from your system. Thank you.

Sunday, June 17, 2012 AOL: Lawyr n TX

**EXHIBIT 10**


**MARCH 30, 2012 EMAIL TO AUSA MICHAEL DAVIS**

Subj:   **Re: United States v. Nicholas Bachynsky - 22-23 boxes documents St. Jude's**
Date:   3/30/2012 4:04:07 P.M. Central Daylight Time
From:   LawyrnTX@aol.com
To:     Michael.Davis2@usdoj.gov

Just a follow up email regarding status of the boxes.  It has been two weeks since we visited by phone.  Let me know something please.  Do not ship the boxes, we will come personally to pick them up.

Thanks.

Craig

In a message dated 2/26/2012 6:53:47 P.M. Central Standard Time, LawyrnTX@aol.com writes:

Dear Mr. Davis:

It appears that the Bachynsky case has now concluded and the issue for return of the 22-23 boxes of documents belonging to St. Jude's Pharmaceuticals is now ripe for resolution.  Towards that end I have enclosed copies of the relevant orders of the court for your review.  We would like to travel to Miami and personally retrive the documents.  Please advise as to a convenient date we might obtain the documents.



# Craig L. Henry
### A T T O R N E Y   A T   L A W

Craig L. Henry
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas 75504-3226
(903) 792-4645 telephone
(903) 792-5073 facsimile

\* \* \* \* \* \* \* \* \* **NOTICE** \* \* \* \* \* \* \* \* \*

Sunday, June 17, 2012 AOL: Lawyr n TX

The information contained in this communication is a transmission from Craig L. Henry, Attorney at Law, and is information protected by the attorney/client and/or attorney/work product privilege. It, along with any attachments hereto, is also covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2512. It is intended only for the personal and confidential use of the recipient/s named in the communication, and the privileges are not waived by virtue of this having been sent by electronic mail. If the person actually receiving this communication or any other reader of the communication is not the named recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (please call collect) and delete the original message from your system. Thank you.

**EXHIBIT 10**

**APRIL 11, 2012 EMAIL TO AUSA MICHAEL DAVIS**

**Subj:**   **Re: United States v. Nicholas Bachynsky - 22-23 boxes documents St. Jude's**
**Date:**   4/11/2012 11:08:12 A.M. Central Daylight Time
**From:**   LawyrnTX@aol.com
**To:**    Michael.Davis2@usdoj.gov

I have still not heard anything from you on the issue of having the 22-23 boxes returned to St. Jude's. Please respond to my earlier emails. We would like to travel to Miami and pick up the boxes as soon as possible. If I do not receive an appropriate response soon, I will have no choice but to file an appropriate motion for return of the boxes with the court.

Please advise via return email.

Craig

In a message dated 3/30/2012 4:04:07 P.M. Central Daylight Time, LawyrnTX@aol.com writes:

> Just a follow up email regarding status of the boxes. It has been two weeks since we visited by phone. Let me know something please. Do not ship the boxes, we will come personally to pick them up.
>
> Thanks.
>
> Craig
>
> In a message dated 2/26/2012 6:53:47 P.M. Central Standard Time, LawyrnTX@aol.com writes:
>
>> Dear Mr. Davis:
>>
>>   It appears that the Bachynsky case has now concluded and the issue for return of the 22-23 boxes of documents belonging to St. Jude's Pharmaceuticals is now ripe for resolution. Towards that end I have enclosed copies of the relevant orders of the court for your review. We would like to travel to Miami and personally retrive the documents. Please advise as to a convenient date we might obtain the documents.



**Craig L. Henry**
ATTORNEY AT LAW

Craig L. Henry
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas 75504-3226

Sunday, June 17, 2012 AOL: Lawyr n TX

(903) 792-4645 telephone
(903) 792-5073 facsimile

## * * * * * * * * * NOTICE * * * * * * * * * *

The information contained in this communication is a transmission from Craig L. Henry, Attorney at Law, and is information protected by the attorney/client and/or attorney/work product privilege. It, along with any attachments hereto, is also covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2512. It is intended only for the personal and confidential use of the recipient/s named in the communication, and the privileges are not waived by virtue of this having been sent by electronic mail. If the person actually receiving this communication or any other reader of the communication is not the named recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (please call collect) and delete the original message from your system. Thank you.